### P. W. TUCKER et al. *v.* PRISCILLA H. STITES et al.

1. WILLS : WORDS IN : CONSTRUED IN THEIR PLAIN, NATURAL SENSE.—In construing wills, words of disposition are to be interpreted in their plain, natural sense, unless a different intention be manifested by the context.

2. SAME : SAME : CASE IN JUDGMENT.—The testator gave a slave to H. until her death, "and after her death to M. and E., then infant daughters of H., or if either M. or E. should then be dead, then to the living one, or if both M. and E. should then be dead, then the slave to descend to the surviving children of H. [the first taker] equally." M. and E. both died before their mother H., leaving issue :—*Held*, that the surviving children of H. were entitled to the slave on her death, to the exclusion of the issue of M. and E.

APPEAL from the Chancery Court of Madison county. Hon. E. G. Henry, chancellor.

*W. P. Harris*, for appellants.

It is insisted, on behalf of appellees, that the limitation over to the surviving children of Susan Hodge depends not on the death of Mary and Elizabeth Hodge during the life of their mother, Susan, only ; but upon their death during her life, and without leaving issue. The court below sustained that view of the will, but, we are inclined to think, from having followed the authority of the case of *Phipps* v. *Acres*, which was quoted at length, by the counsel for the complainants, from 43 Eng. Com. L. R. As the case is reported from the House of Lords it would appear that the words, "without issue," had been supplied by the court; but on examination of the will itself, which is stated in the case in the Court of Chancery, it appears that these words *are in the will.* 5 Simon, *Phipps* v. *Williams*, 44 ; 6 Cond. Eng. Ch. 311, 312 ; at p. 312, "without leaving lawful issue of his body." The reporter of the decision of the House of Lords, having regard to the point decided, which was as to the character of the condition, whether precedent or subsequent, states the case so as to present that point only, and omits the words, "without issue," which are in the will. No case is to be found to sanction such an alteration of a will as is proposed in this

case, and the decision stands without a single precedent and without a single reason. Not only is the alteration founded on *conjecture* merely, but on a conjecture which is repelled by a purpose very distinctly indicated by the context of the will, which purpose is to confine the bounty of the testator to *Susan Hodge* and her *immediate descendants;* for it is manifest that, as between the issue of the *other children,* who might die in the life of Susan Hodge, the surviving children would take, to the exclusion of the issue of the dead, because the limitation is expressly to such children as survive. Again, as between Mary and Elizabeth, the preferred objects of the testator's bounty, the *survivor* living at the death of Susan Hodge would take the whole by the express words of the will. In two places in the will where the *issue* of children might come in conflict with the surviving children of Susan Hodge, the will has given the property to the *children,* excluding grandchildren. There is therefore a uniform purpose expressed. As between one of the preferred objects and the issue of the other, the survivor is preferred. As between the *issue* of both and "other surviving children," the surviving children are preferred. As between the issue of the other children and the surviving children, the same preference for the *children* over *grandchildren is expressed.*

To make the proposition apparent, and with a view to the discussion of the authorities to be hereafter noticed, we propose to give the character of the limitations in the will. A life-estate is first given to Susan Hodge, the mother, and the testator designing to secure a benefit to her immediate descendants, which he could not do by a gift of the *absolute property to the mother, which would have vested the property* in Hodge, *the husband,* limits the remainder after the life-estate, to Elizabeth M. and Mary L. Hodge, in terms which, under the doctrine as stated by Roper, would give them the property in *joint tenancy.* 2 Roper Leg. 260.

Assuming the remainder to be vested, (and it is not necessary to controvert it here, although we may present some considerations on the point hereafter,) this *joint* interest was subject first to be divested in case one of the two infant daughters only survived the mother—that is to say, the interest of the one dying in the lifetime of Susan Hodge, the mother, would go over to the

survivor, provided the survivor also survived the mother. If either be then dead (that is, at the death of the mother) then the said negro to descend to the living. The joint vested interest, however, remained vested as between the infant daughters until the happening of this contingency which affected that joint interest as between the two infant daughters, and as it did not happen, the interest given to the remained unaffected, so far as that particular contingency was concerned, for not only must one die in the lifetime of the mother, leaving the other living, but the living must be alive at the time of the mother's death to take the whole interest, according to the doctrine in *Harrison* v. *Foreman*, 5 Ves. 207 ; 2 Williams Exors. 1091.

If, however, one had survived the other and also Susan Hodge, she would beyond all doubt have taken the whole interest, to the exclusion of the "issue" or representatives of the one who died.. Whatever doubts may be suggested as to the survivorship of the joint estate or interest first given, it does not admit of controversy that where, by express words, the testator gives the property to the *survivor* on the death of one of two joint legatees, the survivor would take it against the representatives of the deceased. The interest, though vested, not affected by the contingency just spoken of, was subject, however, to a condition. which did divest it. If both should then be dead, the said negro to descend to the surviving children of said Susan Hodge *equally*. This limitation, of course, is contingent. The interest given is a tenancy *in common*. The word "equally" was used to such children of Susan Hodge as shall survive her and the two infant daughters. The word "surviving" has the same meaning as the word "living" in the previous limitations, and means, at the death of Susan Hodge. *Surviving children* is a qualification of the legatee, and they must answer the qualification in order to take. The issue of such as might die in the lifetime of Susan Hodge are necessarily excluded: 1st, because children alone can claim, there being no reference to grandchildren; and, 2d, the interest being contingent, it could not vest in those who died before the vesting of the estate, and consequently no interest could be transmitted to representatives. Again, unless some one or more of the children, who were to take after Mary and Elizabeth,

survived Susan Hodge, the previous vested estate would remain vested, because it could only be divested in case the whole contingency happened, to wit, the death of both the infant daughters in the lifetime of Susan Hodge and others surviving that event. 1 Jarm. 750.

Neither of the "infant daughters" survived Susan Hodge, the mother, and there were surviving children of Susan Hodge at her death; so that the limitation over to surviving children took effect according to the terms of the will. It appears therefore that, by force of clear, unambiguous language of the will, and by the known rules of the law, the testator intended to exclude the issue of *such* of the *children of Susan Hodge as died in her* lifetime. In regard to the issue of those children, who were postponed to the two preferred infant daughters, beyond all doubt, on the plainest rules of construction and the familiar doctrine of the books, they could not take in any event, for no interest could vest in their parents to be transmitted to them, and they are not named in the will; and, secondly, the estate given to the infant daughters could only be divested in favor of *children* of Susan Hodge, for the court cannot on any possible ground hold that the term children meant *grandchildren,* in construing a *condition* which was to defeat a *vested interest.* Here then is a purpose to prefer the *living children* to the issue of the dead, demonstrably shown. Shall this manifest intention on the face of the will yield to a conjecture which conflicts with the language of the will? The same kind of contingency affects the limitation to the two infant daughters, and is expressed in words having the same meaning. The death of the mother is the event on which the limitations are to take effect. If either be then dead, then to the living; if both, then to the surviving: living and surviving mean the same thing, and have regard to the same point of time —the death of the mother. Now, as between the preferred objects, the *living* is to take the interest of the deceased, to the exclusion of the representatives of the deceased. · If both be then dead, then the surviving. No mention in either case is made of death "without issue." Language having the same import is used throughout, and the same legal effect given to this language conforms to a purpose indicated in an unmistakable manner in

the will.   Suppose the facts should give rise to a controversy between the "issue of one of the postponed children and the surviving children of Susan Hodge: would the court feel authorized to insert the words, "and the children of such as may be then dead," after the words, "surviving children of Susan Hodge?" The same conjecture could be indulged on the same grounds, to wit: that we see no reason why the testator should wish to cut off the issue of a deceased child.   Suppose the facts to give rise to a question between the issue of one of the infant daughters and the other surviving or living at the mother's death, would the court feel authorized to insert after the words, "if either should be then dead," the words, "without issue," and if so, on what warrant?   The court could only say, We can't see why the testator should have preferred the living child to the issue of the dead.   But would the court venture to make this alteration without a word or sentence to justify it, on a mere conjecture that possibly the testator did not mean what he said?   As between the preferred objects, the language gives the preference to the surviving child over the issue of the deceased; as between the postponed children, the *language* gives the *same preference,* and the operation of law gives it.   If, in these two instances, we find the preference indicated, on what pretence can we say that, as between the issue of the preferred objects of his bounty and the postponed children of Susan Hodge, he preferred the "issue" to the living children?   Shall we conjecture that he preferred them, or assume that it seems to us he ought to have preferred them? The testator has indicated a preference for two infant daughters, over the other children.   Shall we inquire why he did so, or go on to surmise the reason?   Is the language in which this preference is indicated less dubious than that in which he has described the events on which the subsequent or alternative limitations are to take effect?

It is not to be supposed that the testator did not know how to protect the issue, if he designed to give them a benefit.   Mrs. Hodge is clearly the first object of his regard, but he does not give her the property absolutely.   He knew the law would give it to her husband, and all benefit to her children would be cut off.   No rule of law is better understood among unlearned men

than that which gave the personal estate of the wife to her husband. The most ignorant man in the country knew the effect of marriage on the personal property of the wife, as the law stood in that day in Alabama—the common law. The testator knew the children of Susan Hodge; he had seen them; and he determined to give them a benefit, and adopted the only course which could effect his object, and that was, a limitation to them by way of remainder. It may be assumed that, in limitations of personal property to females, no benefit is intended for her issue, unless there is some provision securing the property to them, because she could not have lawful issue without marriage, and marriage divested her title; and the testator could not be supposed to contemplate the event of issue without also contemplating the event of marriage, which would operate necessarily to defeat them. In assuming, therefore, that the testator could not have intended the property to go over in case of issue, we do so in a case where it is apparent that the *husband*, and not the issue, would get the property, as the law then stood at the date of the will, because, on the marriage of the legatee, her rights would vest in her husband, and her death, leaving issue, would not give the property to the issue, and the failure of the limitation over would render the husband's title absolute, to the exclusion of the issue.

In gifts of personalty it can never be assumed that the posterity of the donee are contemplated unless they are expressly named. Payne was a stranger in blood to the objects of his bounty. No motive to build up an inheritance for family reasons can be imputed to him. His attachment was to the persons, not to the blood. The children of the "infant daughters," whom he might never see, the offspring of a man he did not know or conjecture, formed no basis for the dispositions of his will. He wanted those whom he knew and liked to have the property; Mrs. Hodge, as long as she lived, and after her Elizabeth and Mary—provided they were living when the *estate* of the mother determined; if they, her immediate descendants, were dead, then such of the children of Susan Hodge as might be living were to enjoy it.

The examination of the structure and language of the will, and the character of the limitations which are the subject of investi-

gation, and the evidences of intention on the face of the will, and of the conjectural intention founded on the relation sustained by the testator to the objects of his bounty, independent of the conclusion to which it inevitably leads that the testator has made his own will, and has described accurately the events or contingencies on which the ulterior limitations are to take effect, serves at all events to show how very hazardous it would be for the court to add another event to the one indicated by the testator, by supplying the words, "without issue," in every place where the contingency of death only within a particular period is mentioned by the testator.

Proceeding with the investigation, we will next inquire whether the condition annexed to the interest of Mary and Elizabeth is repugnant to law or public policy as it stands in the will, and whether there is any rule of property or condition of its tenure which is opposed to the effect of the condition as it stands in the will. That it is not illegal we need not attempt to show. It was never conceived by any one conversant with the subject that there was any policy which forbids that I shall limit personal property to A for life, and at his death to B, but if B should die in the lifetime of A then to C. Such dispositions are common. There is no ambiguity about them. Nor can any objection be made to the following: To A for life, and if at A's death B shall be living then to B, but if B die in the lifetime of A then C shall take.

According to the rules of law in construction of wills, the first is an example of a vested interest in B subject to be divested by his death in the lifetime of A. The second is an example of contingent alternative limitations, one of which must take effect on the death of A. The ulterior limitation might vest before A's death, to wit, if B should die in A's lifetime there is nothing to prevent the limitation to C from taking effect. It cannot be pretended that in giving effect to the limitations over on the event mentioned, the death of B in A's lifetime, in either case defeats any intention we can gather from the will. There is no ambiguity and no room for speculation. We may say that we don't know why no provision is made for the children of B, in case he should have children, but it is enough that the testator

has made no provision for that event, nor has he indicated that he contemplated, or if he contemplated it, that he intended to provide for it. If B was the eldest son of the testator, and there was no other provision for him, our surprise would be great, but if B was a stranger to the blood of the testator, our surprise would be less.

Supposing B to be the eldest son or only child, male or female, of the testator : we would say that certainly, if the testator had contemplated the death of B, leaving *issue* surviving him or her, he certainly would not have provided . against it, for it is difficult to believe that he could wish to see his property pass from his own lineal descendants. Nothing is clearer, however, than the proposition, that this reasoning, however plausible, is not a sufficient warrant for inserting the additional contingency. The rule is thus stated by Roper, 2d vol., p. 322 : "When the testator, in the disposition of his property, overlooks a particular event which, had it occurred to him, he would in *all probability* have provided against, the court will not rectify the omission by implying or inserting the necessary clause, conceiving it would be too much like making a will for the testator rather than construing a will already made."

If in any other part of the will the testator had *noticed the issue* of B in such way as to indicate that the property was not to pass out of his family so long as he had *issue*—as in the case of *Spalding* v. *Spalding*—where the testator noticed the issue by declaring that the property should not go over until all his sons died without issue. Cro. Car. 185, cited in 1 Jarm. 427. The court put the decision upon the ground that it appeared that the property was not to go out of the family until his sons died without issue by the express language of one part of the will.

The argument in the court below put much stress on the fact that the interest of Mary and Elizabeth *vested* on the death of the testator, adverting to the well-known doctrine of construing conditions subsequent which operate to divest an estate vested . strictly, as of sufficient energy to justify the alteration of the condition, or adding to it another contingency not mentioned. The only advantage which that feature of the limitation gives is, that it is essential to give title to the representatives of the

legatee, who could not possibly pretend to any interest unless the legatee had a vested interest. It has this additional advantage, which the testator doubtless contemplated: it left no intestacy of any interest in the slave, and gave it to the representatives of the infant daughters; in case all the *children* died in the lifetime of the mother, the slave would go to them, because all the events must happen to divest the estate, to wit, the death of both the infant daughters, and the surviving of other children of Susan Hodge.

The courts, however, do not place the power to insert words in a will on the ground that it prevents the divesting of estates. The practice stands independent of that. They supply words only by the authority of an intention collected from the context, and by the light of that intention. Under the doctrine of construing conditions of this kind rigidly, the books cite the example of a case in which the courts require all the events mentioned to happen, as in 1 Jarm. 750. But the doctrine has never been invoked to justify the addition of a contingency or event nowhere mentioned in the will. The law favors the vesting of estates for many reasons, and courts lean to a construction which will vest interests given and avoid *suspending power* over property. But yet this disposition has always been indulged in subordination to the higher doctrine of conforming to the declared intention of the testator. It cannot be said that law or policy renders a determinable fee void, or demands that the court shall prevent the taking *effect of the limitation over,* by *adding conditions not imposed by the testator.* It was never hinted until now, that there could not be a fee determinable on the *death* of the donee within a particular period, and that a bequest of personalty to A, and if he dies in the lifetime of B then C is to take, was ambiguous, unreasonable, or that such limitations standing alone evinced an intention that C should not take *unless A died before B, and left no issue.*

There is not a case to be found which would sanction the introduction of the words, "without issue," in a will like the present, or which sanctions a principle which would authorize it.

There is a class of cases establishing the proposition that where an absolute gift of personalty is made to A, and then there

is a limitation over "in case" of his death, vests the property absolutely in A if he survives the testator; or if a life-estate precedes the estate given to A if he survives the tenant for life; and in these cases the court may be said to supply the words, "during my life," or, "during the life of the tenant for life;" on the ground, however, that an absolute gift is made, and then the testator has used words importing a contingency, and, as death *simpliciter* is no contingency, there is an ambiguity in the expression. We are at once impressed with the idea that the testator has imperfectly expressed himself, while it is manifest that he has not intended to give a mere life-estate to A. But it is conceded on all hands that if the testator had said in case of A's death *in the lifetime of B,* or under twenty-one, the court would have no pretext to add any other event. There could be no ambiguity or inaccuracy, no contradiction or inconsistency.

There is a class of cases establishing the proposition that courts may supply, transpose, or reject words in wills. The statement of the proposition of itself admonishes us that the court, in doing so, must do so by the authority of the *will itself,* and not upon conjecture or surmise of the court. There is, under the rule, no warrant for the exercise of this delicate power, but the *manifest* intention of the testator apparent on the face of the will and gathered from the context. 2 Roper Leg. 322. The court looks for this warrant in the will itself. The language and the structure of the will must clearly indicate the *intention* which is to guide the court in adding words or altering the will.

The doctrine on which the proposition rests should be considered and analyzed carefully. The court will supply words necessary to effectuate a plainly-declared design, when the design or general intention is so manifest from other parts of the will that we are compelled to regard the will as imperfect by reason of an *omission* made palpable by this manifest intention disclosed by other parts of the will. The starting-point of the doctrine, and the warrant for its application, is an *intention* so manifest that it may be affirmed with moral certainty. For if the intention which is to be the guide in inserting words not used be *itself doubtful,* the court cannot venture to act on it, because the

court would then in many cases make the will. The intention, therefore, must be conspicuously evinced by the language and the structure of the will itself; and although the relations of the objects of the testator's bounty to him, and the character and condition of his estate, may be considered, yet the *structure* and *language* of the will *must conclusively* support the intention which is to guide the court in putting words in a will.

The cases in which the court has ventured to supply words, or alter the structure of wills, are aptly characterized as cases in which an *obvious intention* has been "*imperfectly expressed.*" The distinction between an intention inferred from the supposed feelings of the testator or the merits of the legatees—or, in other words, an intention which we derive from what a testator would probably do under certain circumstances, or how we would expect him to do for certain persons—and that intention which the will unmistakably indicates, is to be kept in view.

The distinction between conjectural intention and intention resting on the language and structure of the will should be clearly drawn. Courts cannot invoke conjectural intention in the delicate matter of altering a will. The spirit of the rule is, that an intention which is manifest on the face of the will cannot be effectuated owing to some inaccuracy of expression or palpable omission.

The cases collected in 1 Jarm. on Wills, 427, (and see note citing Virginia cases,) serve to illustrate the rule. A devise to A and the heirs of his body, and, if A should 'die, then over. If this was a bequest of personalty, it would fall under the doctrine before stated, where death is spoken of in language importing a contingency, &c. It is, however, a devise of real estate, giving an estate tail to A in express terms, followed by a limitation over in case of his death. Two things very distinctly appear : to give effect to the limitation over on the inevitable event of A's death is in effect to reduce his estate to a life-estate; 2, the words, "if A should die," import a contingency indicating that the testator meant death within a period or under particular circumstance, for it is not contingent *simpliciter*. Again, it distinctly appears that he intended a benefit to A's issue, and that he intended to create an estate tail. The issue of the tenant in

tail take *per formam doni*. The issue take by force of the gift, and, when an estate tail is expressly limited, it is conclusive that the testator intended to give them a benefit. This intention is perfectly manifest, and it is also manifest that the testator omitted the circumstance which created the contingency which his language plainly shows he had in his mind, and that to give effect to the language used is to contradict one part of the will. It is manifest that A was to have an estate tail determinable on a contingency, and death alone is not a contingency; the only contingency compatible with the intention is the death of A "without issue," and accordingly these words are supplied. So in *Spalding* v. *Spalding*. The court saw by one part of the will that the testator had provided that the estate should go to his collateral kindred only in the event of the failure of the issue of all his sons. It was an incomprehensible will if attempted to be carried out on the literal words of both parts of it; for, if John should die leaving issue, and William and Thomas both die without issue, then neither issue of John could take any part of the lands, nor would the lands vest in the nephews, while it was evident the testator intended to part with his whole estate. Besides, he gave part of the lands to John and the heirs of his body, thus showing he intended the issue of John to be benefited, and then that the nephews should not take while John had issue living, which still more clearly evinced the intention that the issue of John were intended to be provided for. To strengthen this view, although the circumstance would not by itself have been sufficient, the testator had given lands to another son to go over to John on default of issue; showing that the testator did not intend to disinherit John. We might proceed to analyze the other cases to be found collected by Roper and Jarman, but it is sufficient to say of them that on the face of the will the intention is made out beyond all reasonable doubt which demands the correction of the will. The ambiguity is apparent, and the inconsistency of the particular clause with a general purpose manifest on the face of the will. Now, in the present instance, when we come to the part of the will which says, "if both should be then dead, then over," there is no ambiguity in these words. Is there any other part of the will which tends to

show the testator meant more than he has expressed? If, in the part where he gives the property to the "living" of the two daughters if either be "then dead," he had said, "if either be then dead, *leaving no issue*," we might say that this provision indicated that, as between the two preferred objects of bounty, the testator evinced an intention that the issue should be taken into the account, it might fairly be inferred that the same thing was implied between these preferred children and the others; but the testator has not used that language nor any equivalent language, although the death of the children was present to his mind, and there were three events mentioned in which the issue of the children deceased might come in competition with the "living" or surviving children; yet in neither case has he shown that he meant more than simple death within a prescribed period, to wit, the existence of the previous life-estate. The testator knew how to provide for children or issue when giving the property in the first instance to the parent, i. e., by remainder to the children. Besides, we are not to forget that this will was made when the common law prevailed as to the rights of married women, when, by simple operation of law, a woman lost all her personal estate by marriage, and when it was generally understood that marriage-settlements and trusts under which the wife could take an estate to her separate use was the only means providing for the posterity of the wife, when it was conclusive against any intention to provide for the wife's family or issue if a simple gift was made to her in terms which gave the absolute interest in personalty.

It would occur to any one that it would be a dangerous exercise of power by a court to alter a will, which is not ambiguous, on any thing not found in it. We have before shown that it is apparent that there was one consistent design to provide for the immediate descendants of Susan Hodge who happened to be alive at her death. The language imports this, and there is a perfect uniformity in the various parts of the will on this point.

It should not be forgotten that cases of marriage-settlements, where issue of the marriage is supposed to be the leading object, are not authority on the question here presented; nor are the cases of executory trusts to be invoked. The testator has left

nothing to be done, except to buy a negro; he declared the limitations expressly, and has done so explicitly, and the trust stands executed.

In regard to the evidence of the intention which is to call for changing the words of a will, the language of the judges has been to the effect that the intention must be *demonstrated* by the will itself. The inference must be "necessary and unavoidable, necessary and indubitable." 2 Roper Leg. 328. Most of the cases cited by Jarman are cases in which the intention is very evident on the face of the will, and a palpable inaccuracy of expression.

See, on the general doctrine, *Leach* v. ——, 6 East. 486; *Dodson* v. *Hay*, 3 Bro. C. G. 407; *Gassick* v. *Drummond*, 1 Sim. & Stew. 517. Indication of benefit intended for issue. *Soulle* v. *Gerard*, Croke Eliz. 525. See case of *Webb* v. *Haring*, Croke James, 415, where devise to A and his son generally, and then to sister if she survives son and his heirs, held to give to an estate tail, for an obvious reason. See *Dean* v. *Bagshow*, 6 Jarm. 512. Virginia cases cited in note to Jarm. 427; 2d vol. 747, 748.

*F. Anderson*, for appellees,

Cited and commented on the following authorities: *Phipps* v. *Akers*, 43 Eng. C. L. R. 569; 1 Jarm. on Wills, 427, and authorities there cited; *Kentish* v. *Newman*, 2 Peere-Williams, 234; *Sale* v. *Sanders*, 24 Miss. R.; *Duncan* v. *Johnson*, 23 Id. 130.

*W. Yerger*, on same side.

The will in this case, having been made in Alabama, is of course governed by the laws of Alabama in its construction. An examination of the statutes of Alabama shows that no statute was in force there when the will was made, having any bearing upon its construction. And the Supreme Court, in the case of *Catterlin* v. *Hardy et al.*, 10 Ala. R. 511, decided in 1845 that the rules of the common law on the subject of remainders were in force. In the same case it was also held, that a conveyance of a slave to A and his wife during life, and after their decease to their children, is valid.

Looking to the common law for the construction of this will,

we are able to pronounce that the bequest gave to John and Susan Hodge an estate for life in the slave during the life of Mrs. Susan Hodge; that Mary and Elizabeth Hodge, her two children, took a vested estate in fee in remainder, subject to be divested on the happening of the contingency named; and that the "surviving children" of Mrs. Hodge had a contingent executory devise, which might take effect on the death of both Mary and Elizabeth during the life of their mother Susan. It is said by those representing the surviving children that this contingency has happened; that Mary and Elizabeth having died before their mother, the estate vested in them was thereby divested, and the title of the "surviving children" thus became absolute.

As before remarked, the interest which Mary and Elizabeth Hodge took under the will was a vested remainder in fee. A remainder is said to be vested " when there is a person in being who would have an immediate right to possession of the property on the ceasing of the precedent or intermediate estate." And " though it be uncertain whether the remainder will ever take effect in possession, it will nevertheless be a vested remainder if the interest be fixed." 4 Kent's Com. 214, 8th ed. There is another rule which has an important bearing upon this inquiry. This estate, having vested, could only be divested by a condition subsequent, and it is well established that " conditions subsequent are not favored in law, and are construed strictly because they tend to destroy estates, and the rigorous exaction of them is a species of *summum jus*, and in many cases hardly reconcilable with conscience." Hence a court of equity will never lend its aid to divest an estate for the breach of a condition subsequent. 4 Kent's Com. 134, 8th ed.

Again, it is an established rule in construing wills that the intent of the testator shall be ascertained from the whole will, and that intent, when ascertained, shall be carried into effect, even where it becomes necessary to supply additional words in order to effect it. This rule will be found laid down in 1 Jarm. on Wills, 427, in which several cases are cited, in which estates by will were devised to a party and his issue, with a limitation over in the event of the death of the first taker by or before a

particular time.   In all these cases, although the limitation over was to take effect on the death of the first taker, yet the court added the words, " without issue;" believing such to have been the true meaning of the will.   So in a case reported in 43 Eng. C. L. R. 569, *Phipps* v. *Akers,* where an estate was devised to A, but if he died before twenty-one then to B.   The question was referred by the House of Lords to the King's Bench to decide what estate A took under the will; and Tindal, C. J., declared that he took a vested estate in fee, subject to be divested on the contingency of his death before twenty-one *without issue;* the words, " without issue," being supplied to carry out the intent.

Construing the present will by these rules, let us see the result.   It appears that there were several persons named by the testator who were the primary objects of the testator's bounty.   First, Susan Hodge—but as to her the will is explicit: she was only to take an estate *for life.*   Secondly, Mary and Elizabeth Hodge, infant children of Susan Hodge, were also the objects of his bounty.   To them it was his intention to give an estate in fee, after the death of their mother.   That was his primary and leading intention, but it might happen that they would die before their mother.   What then was to become of the estate ?   That also is provided for.   It was then to go to other "surviving children" of Susan Hodge.   But it must be remembered that the will vested a fee simple in Mary and Elizabeth Hodge—an estate of inheritance to them and their heirs.   When the testator was providing for the estate to pass to others on their death, was it his intention or wish that the fee he had already given, and which it was his intention to give, should be divested— taken from the heirs to whom it was already limited, if there was any one in existence capable of taking, or was it his intention only to divest in the event that Mary and Elizabeth died *without children* capable of taking that inheritance in the lifetime of Susan Hodge ?   I think a fair construction of the will will justify this latter view, because in this way the primary object and intent of the testator is carried into effect—an intent manifested by his limiting or granting to them in the first instance a vested estate in fee in the slaves.

This is the reason which governed the court in the case of *Phipps* v. *Akers*, in 43 Eng. C. L. R. 569. And, applying the rules of common sense to this case, it seems absurd to hold that it was the intention of the testator to give an estate in fee to Mary and Elizabeth Hodge, and so to provide in it that, if they survived Susan Hodge one day or even only one minute, the slaves should become the property of any children they might leave, and at the same time to declare if they died one day or even one minute before Susan Hodge the estate should not descend to their children, but should pass to others. A view so preposterous it seems to me ought not be entertained. But it can only be obviated by holding that, when the testator speaks of their dying before their mother, he meant their death without children or issue capable of taking the inheritance he had in the first instance granted them.

HANDY, J., delivered the opinion of the court:

The bill in this case shows that Elias L. Payne, by his will, bequeathed to Mrs. Susan Hodge a sum of money sufficient to purchase a female slave, which slave when purchased was to be held by John Hodge and said Susan, during the lifetime of the said Susan, " and after her death the said slave and her increase, if any, to descend to Mary L. Hodge and Elizabeth M. Hodge, then infant daughters of the said Susan; or if either of the said infant daughters should then be dead then the said slave as above to descend to the living one, or if both should then be dead the said slave as above to descend to the surviving children of the said Susan Hodge equally." The slave was purchased according to the will, and held by Susan Hodge until her death in the year 1858. Mary L. and Elizabeth M. Hodge both died in the lifetime of Susan, leaving the complainants, their children, who claim the slave and her increase in right of their mothers, under the bequest to them above stated, against the defendants, who were the surviving children of Susan Hodge at the time of her death. And the question presented for our determination is, whether, under this clause of the will, the slaves went to the issue of Mary and Elizabeth on the death of Susan, or to the surviving children of Susan.

There is no clause or disposition in the other parts of the will tending to show what was the intention of the testator in this clause, or that he had any particular object in view except that which the words employed indicate. We are, therefore, in interpreting the clause, left to the legal force of the language used, unaided by circumstances shown, calculated to explain or control them; for the general rule undoubtedly is, that words of disposition in a will must be construed according to their plain, natural sense, presuming that the intention of the testator is thereby fully expressed, unless an intention different from that imported by the words be manifested by the context.

Applying these principles to the clause in question, it is very clear that the slaves, upon the death of Susan Hodge, went to her surviving children, and not to the issue of her children who died in her lifetime. The words are plain and explicit: to Susan Hodge until her death; then to her daughters Mary and Elizabeth, or, if either of them should then be dead, to the survivor; if both should then be dead, to the other surviving children of Susan Hodge equally. There is no ambiguity in the language; and the disposition made by it is sensible and natural, according to the import of the words, and such as the testator might reasonably make. It would seem that the *children* of Susan Hodge were the especial objects of his consideration; that he intended to bestow a personal benefit upon the two named if they lived to enjoy it, but if they did not, then he bestowed it upon other children of Susan Hodge who might be living at the time of her death. It does not appear that he contemplated that the children named might die before the slaves vested in them, leaving issue; and there is nothing to warrant the construction that he intended the limitation over to the surviving children of Susan Hodge to take effect only upon Mary and Elizabeth dying *without issue.* On the contrary, the language is plain that it was to take effect upon their dying before Susan Hodge. The several dispositions are alternative, and must take effect according to the terms plainly expressed.

The authority mainly relied on, in support of the contrary construction, is the case of *Phipps* v. *Akers,* 4 Mann. & Grang. 1106, (43 Eng. C. L. R. 569.) But that case appears to have no

application to the question presented here. It was a devise of lands to A in fee simple, "when and so soon as he should attain his age of twenty-one years; but, in case he should die under that age," then to go into the residuum of his estate, which was left to C. The testator died seized in fee of the lands, and leaving A under twenty-one years of age; and the question was, what estate A took. That question turned upon the point whether the estate devised to A was not upon the condition precedent of his arriving at twenty-one years of age; and it was held, under the peculiar phraseology of the will, that A took an immediate estate, subject to be divested in the event of his dying under twenty-one, and without issue. The consideration whether he died with or without issue did not arise in the case, and had no effect upon the point presented for decision, which was simply whether A took any estate before attaining majority. This being the point of controversy, the report of the case in the book above cited, in stating the language of the will, omits to state that the limitation in the will was, in case A should die before twenty-one "*without leaving issue of his body;*" because these last words were immaterial to the question in controversy. But these words are found in the will as it is stated in the same case, while it was in the Court of Chancery, and as it is reported in 5 Simons, 44, *Phipps* v. *Williams,* 6 Eng. Ch. R. 311.

We are of opinion that the demurrer should have been sustained; and accordingly the decree is reversed, and the bill dismissed.